We have six cases on the calendar this morning. Two tax cases from the Court of Federal Claims, a patent case from the District Court, a government employee case, and two veterans' cases, one of which with the employee case is being submitted on the briefs and is not being argued. The first case, which is not a case about fruit, is GRAPEVINE IMPORTS v. United States, 2008, 5090. Mr. Rothenberg. Thank you, and may it please the Court. Yesterday's Supreme Court decision in Mayo Foundation not only confirms the astute planning of the ABA tax section, which has scheduled a panel discussion on deference next week at its mid-year meeting, but it also foreshadows, we think, how this appeal should be decided. Indeed, the parallels between the two cases are striking. And before I go on, I want to make sure the Court did get our submission of the opinion. In Mayo Foundation, there was ongoing litigation throughout the country about whether these medical residents were subject to FICA. And the question was, the statutory term was student, and the question was, did medical residents constitute a student? The Internal Revenue Service's position, before there was any regulation, was that if you were working full-time, you were not a student. During the midst of that litigation, which some decisions held for the government, some for the taxpayer, the government, the Treasury Department, issued a regulation saying if you work more than 40 hours a week, you're a student. But can I interrupt? I appreciate that you want to discuss the recent case. But it seems to me, is Mayo not different from the case we have before us? Because in Mayo, there was no prior Supreme Court opinion dealing with those regulations, right? I mean, that's what makes this case a little more complicated. Well, this case is a little more difficult, but we do not think the colony decision controls this case at all. Well, I guess, so that's my inquiry. Why? And is that predicated on the government's position in its brief, which seems quite clear to me, so correct me if I'm wrong, that post-Grand Acts, we don't do the Chevron analysis of legislative history to find the clear intent? You say quite stridently, I think you agree, that after Grand Acts, you don't look at the legislative history for the first step of Chevron. It's only the text of the statute. Is that your position? Well, that is our position. The courts are all over the map on this. There's the concurring opinion in the tax court case of Intermountain, there's a concurring opinion we discuss this through several pages, which courts look at legislative history in Chevron step one, which courts do not. This court, in one of its decisions, has looked at legislative history for step one. And in at least two cases. At least one or two, without discussion of Grand Acts, we think that you look solely at the plain terms of the statute. Where we think legislative history fits in is that if you have a word in the statute, let's say Mayo had the word student, you could look to legislative history, we think, to define what did Congress have in mind when it used the word student to determine the meaning of a statutory term. But I don't think you can look at legislative history and say, well, the statute is ambiguous. Legislative history shows a clear Congressional purpose, otherwise we can go with that purpose. What if the legislative history in Mayo had been quite explicit and said by student we mean X, Y, and Z? Would the court have been compelled to consider that before it deferred to the agencies? The court would have had to do two things. Number one, it would have to decide, can we look at legislative history in Chevron step one? Well, that's already been decided by Chevron, right? I mean, Chevron is quite explicit. Is there something I'm missing here? I mean, Chevron quite explicitly says in the face of ambiguous statutory language, you look to the legislative history for a clear intent of Congress. Am I wrong? No, you're not wrong. But in the absence of a regulation, before the regulation was issued in this case, courts could interpret omits from gross income at least two ways, one way in favor of the taxpayer, one way in favor of the government. Once a regulation is issued, I think, however, Brand X says unless the plain terms of the statute are clear, it doesn't matter what the legislator said, it matters what they wrote down in the statute. But that does seem to be inconsistent with what Justice Stevens in Chevron said about the use of the other tools of statutory construction, including, of course, legislative history, when he talked about what you do at step one. What you seem to be suggesting is once there's a regulation in the picture, which, of course, there always is or often is when you're dealing with Chevron issues, that step one becomes truncated in a way that Justice Stevens would not have agreed and indeed in more recent opinions has indicated he wouldn't agree that step one should be truncated. To answer that question, I think that if the statute uses a term and the legislative history makes clear, we mean, I think in your example, student means less than 40 hours. Then I think a regulation which took a different interpretation of the meaning of student might not be valid. Well, I'm having a hard time understanding then what role exactly legislative history has in your view of the post-Brand X world. To go back to Judge Post's question, if the word student in the legislative history were used in a particular way, which was, I mean, we start with the supposition that the statute is ambiguous on its face. That's otherwise the case over. All right, so the statute is ambiguous. It uses the word student, which we can say, well, who knows. And then in the legislative history it says what we intend for this statute to do is to sweep broadly and include everybody that's studying. Are you saying you look at the legislative history in that situation, even though the service has promulgated a regulation saying that we construe student very narrowly? It has to do with the meaning of the actual. I come back to the words. If you use one word and the legislative history says, by this word we mean X, then I don't think you can have an administrative regulation that says that word means Y. How about the word omission or omitted? Well, if I get back to colony, there are four words in the phrase, omits from gross income. And when you read the colony decision by the Supreme Court, the colony decision says, well, the government wants to tread lightly on omits and bears down hard on gross income. Now, if you tread lightly the other way around, the court might have come the other way. Those are ambiguous terms. No, but the court in colony acknowledged that the statutory text was ambiguous. That's looking at the text. But when they were then led to the legislative history, as you say is kind of permissible in the ambiguity, I mean, at least I take away from colony, their discussion of the legislative history is quite strong. Pervasive evidence, they completely reject the government's position. They say Congress, we think in enacting blah, blah, blah, Congress manifested no broader purpose than to give the commissioner whatever. So at least the Supreme Court read the legislative history in my view in colony to be quite explicit, quite clear. And if you agree with that, then how is that different from the hypothetical about Mayo? Well, I'm a little bit limited because I can't argue that this court can, without looking at the regulation, hold for the government because of the Salmon Ranch precedent. The important part to answer your question is that the Supreme Court was interpreting the 39 code and that was different from the 54 code in several major respects that we went into in our brief, a little bit here but more in Salmon Ranch. And that is if the Supreme Court said in colony 39 code was ambiguous, language was ambiguous, but 54 code in this instance was unambiguous, then you look to see what were the changes between the 39 code and the 54 code. And as we pointed out again in our briefing in Salmon Ranch in this case, it was significant because there was a trader business exception put in 1954 code that wasn't there in 39. And it's important to remember that when the 54 code was enacted with these two additions, a trader business and adequate disclosure, the appellate courts prior to 54 had split over the meaning of omits from gross income when you're dealing with a trader business. So that's the Supreme Court accepted cert in colony even though the 54 code straightened out the rule post 54, but there was a conflict and I think it's important to... So when you talk about the distinction between the 39 code and the 54 code, are you talking about the language or the legislative history that drives the difference? No, I'm talking about the insertion of two different provisions in the 54 code. So that's your view, your read on colonies final sentence where it talks about the... That is exactly what I read because the 54 code, if colony had been subject to the 54 code, there would have been no colony case because that taxpayer would have clearly won because it was a trader business and it got the exception that it specifically wanted. But isn't that inconsistent with the... I mean the court concluded the language in the 39 code was ambiguous and does the language you're talking about that was inserted in 54 really change your view on how the court was construing the operative phrase in the 39 code? I mean that didn't change. But you have to look at that language in context of the entire statute. What does it cover? Does it prevent taxpayers from hiding the ball? You didn't have an adequate disclosure provision in the 39 code. You do in the 54 code. So I think there are different parameters that come into play when you're looking at does colony control this case? Our position is no, it does not. But the argument you've been making for the last couple of minutes is really an alternative, as I understand it, to the straight brand X argument that you make with respect to the applicability of colony if you don't have a difference between 39 and 54. Let's assume that colony was decided based on 54 and it said, number one, the statute is ambiguous, but number two, the legislative history leads us to conclude that the statute has to be read in a way that's contrary to the government's reading. Your argument on that predicate would be that brand X says you can ignore what the court said, if I understand your argument. You can ignore what the court said about legislative history as long as it said that the plain text was ambiguous, correct? We think that is a proper way to interpret brand X. Well, then I come back to my earlier question where I'm having trouble figuring out what role you're assigning to legislative history because in that scenario, it seems to me the legislative history would be you would be looking at legislative history, the court would have, to determine the meaning of a word, the word omitted. And that was, I thought, the situation in which you were saying you can look at legislative history in this Chevron step one setting. So I'm having trouble squaring your assessment of what we ought to do at Chevron step one with your view of how we would look at colony if we didn't have the arguments about the 3154 of it. Well, the legislative history, as the Court of Federal Claims Opinion, in this case, points out, Judge Alengo pointed out, there are some parts of legislative history that support the government's argument about it's not just leaving things out. But come back to my question. I'm really trying to see exactly what role you think post-Brandeis, given your position in Brandeis, legislative history has in Chevron step one. Some role, no role, or what? Some role. And the some role is you look to legislative history to determine the meaning of a statutory word. Or words or statutory terms. Why doesn't that apply to the word omission? Because it's not just the word omit. It's omit from gross income. Well, that's a phrase. You distinguish between a word and a phrase? Well, no, because the meaning of gross income is not clear. The meaning of gross income was not discussed in the legislative history. The legislative history was focusing mainly on the word omits. But isn't that just a way of saying that the legislative history isn't very instructive as you view it as opposed to you don't look at it? What I understood you to be saying in your brief was Brandeis pulls a curtain down between the statutory language and the legislative history. So I've been a little surprised to hear you now saying, well, not really. It's a sort of diaphanous veil. And in some respects you can look through it and in some respects you can't. And I'm having a really hard time figuring what is the permissible consult. I think the permissible aperture is very small, but I don't believe it doesn't exist at all in terms of when you can look at legislative history. I do think the key is, as Brandeis says, the plain terms of the statute. If the statute is plain, A, it doesn't matter what the legislative history says, and B, it doesn't matter what a regulation says. Now, if you start with the words that are plain, words can be interpreted differently, then, again, I think you look at legislative history not to define what was Congress's overall purpose and let's interpret the statute that way. You can do that in the absence of a regulation. You cannot do that when you have a regulation. We think the only role legislative history would play in that role is, is there a single interpretation of the statutory word or phrases, and if that's the only one, then the reg's invalid. Well, the real practical difficulty you're having here is the colony case was decided before the regs. So this problem comes up because the court has decided, and Justice Scalia, I think, in his dissent to Brandeis, kind of refers to it. You've got an interpretation. The court and colony didn't have the regs before it, so it was left. It had to reach a decision, right? It had to pick between one and two. The language of the statute was ambiguous, so it was forced to look at the legislative history, and it was also compelled to come up with an answer. What does this mean? When you're suggesting that in the context when the government has already issued regulations, they don't have to work so hard over the years. Well, I think that's true. I mean, the two appellate decisions that were in this area before the regulations both came down and interpreted similarly to colony, but the landscape has changed. And that's what the Supreme Court's jurisprudence says. If you have an ambiguous statute, the ability to draw the line, the ability to make interpretive choices, those are both phrases used in the Supreme Court jurisprudence, is for the administrator. So do you think, just to back to Judge Bryson's point, do you think that how would you characterize Brandeis' treatment of Chevron? Did it overrule certain aspects of the Chevron analysis or not? Or did it put a gloss on it in terms of even though Chevron clearly allows for legislative history and congressional intent, it only does it in the narrow circumstances that you've tried to argue? Yes, that would be the way we would interpret Brandeis, and that is legislative history by itself. In other words, is your question whether a clear legislative history could trump a clear treasury regulation? If that's what your question deals with, the answer to me, the answer is does that clear legislative history define, determine the statute? So that's the standard you would – so you think Brandeis did limit Chevron to only those circumstances. I mean, Chevron speaks broadly to the congressional intent, to the congressional purpose. You want us to construe Brandeis as narrowing Chevron to that definitional. Well, I think Brandeis and Mayo point out when you have these ambiguities, again, that's why they look to regulations, whether it's by the Department of Treasury or any other government agency. The choice, I come back to it, the interpretive choice, which is up to the courts in the absence of a regulation because it can be one of two ways. Because the agency's in the case of ambiguity, absolutely, and I don't think there's any disagreement among any of us on that broad proposition. What we're focusing in on is how do you decide whether there's an ambiguity, and that's where we're having – that's what this whole discussion that we've been having is all about. What role is anything, any evidence, other than the plain text of the statute? And you're saying some. There's some, but I think we can win under either approach. Understood, but to the extent we need to drive through this pass, the question is – this is, as you pointed out, this is a much-rooted-about issue, and one doesn't sort of lightly say, oh, yeah, Brand X clearly has dealt with that, unless you're pretty confident that it has. I would love to stand here and say the Supreme Court has definitely said this is the role of legislative history when we're dealing with interpretation of the statute. It has not done that. So you don't read Brand X as saying legislative history is out, just to be very clear. But as I read your brief to say that, but you're not saying that. It has – the best way for me to phrase it, it has a very small role, but that role, we think, is trumped by the regulation. Can I ask one quick technical question? The related cases in your brief cited deal with the four circuits, and I guess we've got Intermountain, which is currently up. Is there any of those that have already had briefs in any of the other circuits? I assume they all entail some variation of the issues we've been arguing about today. Yes. What's the status of those? Are any of those close to an opinion? I assume there's been no opinion. No, no opinions yet. This is the fifth appellate argument. The first one was in September. And there is one more scheduled in D.C., Intermountain, and there are at least two other circuits where it will be briefed. So this is throughout the country. It's important. There is a billion dollars of tax at stake in just this issue. And all of the cases will deal now with the final regulation as opposed to the temporary regulation? Yes. We have 28J, the final rate, to all of the courts. So I assume that that other issue, the APA issue, is pretty much a dead letter. Thank you. Mr. Rothenberg, we've consumed your time because the Court's asked a lot of questions. We'll give you back your rebuttal time, and if Mr. Rubin needs more, we'll provide that. Thank you, Your Honor. May it please the Court. I want to start with one point that's not in dispute here. If these regulations did not exist, it's clear that Grapevine would win this case on the controlling precedent of Colony and Salmon Ranch. But even in the face of the final regulation, there's three independent reasons why Judge Allegra should be affirmed. First, the regulations on their face do not apply here. Second, the government should not be allowed to use the regulations to reverse a final judgment that was entered against it in this case. And then finally, the regulations are invalid because they do contradict a clear intent of Congress as established in Colony and Salmon Ranch. Can I ask you, the first one, when you say they don't apply here, is that the argument with respect to the phrase in the regulations as of September 24, 2009? Right. Why isn't that adequately cured by the preamble to the final regulations, which really speaks to what that date signifies? Because I don't think that the preamble is allowed to contradict the clear term of that applicability provision. I mean, the words of the applicability effective date provision say on their face that the regulation only applies with respect to tax years, with respect to which the period for assessing tax was open on or after September 24, 2009. And in fact, in the preamble, the regulation says this regulation is not reopening closed tax years. It's not retroactive. And if you look at a snapshot in time, at September 23, 2009, the day before those regulations went into effect, the law of this circuit in Salmon Ranch and Colony, which Salmon Ranch says Colony controls the disposition of this case, is that that was a closed tax year. We're dealing with a 1999 tax year here. And the government did not file the notice of FPAA for four and a half years after the tax return was filed. So as of the moment, the regulation— You're right. It was arguably a closed case under the three-year statute of limitations. However, the issue was open in litigation. I mean, it's a pending case in which the government has taken the position you're not allowed. So it's different than a case that's long Salmon Ranch, for instance, which was mandated and it's done, right? I mean, there is a difference between that and your case. There's a difference between Salmon Ranch in this case, but there's a very significant difference between this case and cases, for example, like Intermountain, that were still pending in the tax court. The preamble even says, and this was part of our response in our 28-J response, which is the government in the preamble says that the regulation applies to any case that's pending in any court of competent jurisdiction, only those that are not final within the meaning of 7481. And as we pointed out in our 28-J response, 7481 only controls the issue of finality in tax court decisions. We're not here coming to this court from a decision of a tax court. Rather, we're coming to you on a final judgment entered by the Court of Federal Claims. The trouble is the word final. There are final judgments which are not final because they're subject to appeal. So Judge O'Lager's judgment is final in the sense that it is under the rules of that court, the last judgment that he needs to enter in that case to dispose of that case and get it off his docket. That doesn't make that a final ruling in the case in the sense that the case is over and can't be rescued except by collateral attack. But the preamble says, and this was the government's choosing in the regulation that it wrote, the government says in the preamble that we're measuring finality by 7481. And what we said in our response to the 28-J is 28 U.S.C. 6226G says finality is measured by the rules of the court in which this type of proceeding was filed. This proceeding was filed in the Court of Federal Claims. And the rules of finality, as you've identified, are different in the Court of Federal Claims because this court wouldn't even have jurisdiction but for the fact that Judge O'Lager issued a final judgment. The Intermountain Court, the seven judges in the majority, called the government's analysis here circular and result-oriented and even conflicted with— You're right. I mean, they took issue with the language in the reg itself, but they didn't have an opportunity—am I wrong? They didn't have an opportunity yet to construe the impact of the preamble on them. They didn't, but actually the final regulation is now even stronger. I think there's a stronger case that the reg is inapplicable now than the temporary reg because this final reg in its preamble says it's not retroactive and we're not reopening closed tax years. That's a statement that didn't even exist at the time of the temporary regulation. But it's closed tax year only if they're wrong in thinking that the six-year limitation applies. Right. And you say, well, the three-year limitation applies because this court said it was so. Well, you know, not everything this court says turns out to be so. But I'll segue to Brand X because this court didn't merely choose the better of two options, saying this court held in Salmon Ranch that colony controls the disposition of this case. And colony made clear that while the words by themselves—and the government really hangs its hat on that first statement. We cannot find that the words are unambiguous here. But after that sentence, there is—colony was decided in 1958. There was no Chevron, so we wouldn't expect to hear the words of a Chevron analysis. But when you read— Well, there were no regulations in place, so— And there were no regulations in— —for that reason. Fair enough. But when you read the rest of the decision, Judge Proust, as you pointed out, three or four times the Supreme Court makes clear that it was absolutely Congress's intention that an overstatement of basis didn't constitute an omission from gross income. And it wasn't merely that the court looked at legislative history and said, we think that Congress's intent is clear when we look at these other tools, like legislative history. The Supreme Court rejected the government's analysis. The Supreme Court said that we've been unable to find any solid support for the government's position in the legislative history and said to accept the commissioner's interpretation would read the statute more broadly than justified and create a patent incongruity in the tax law. We would submit that there was no gap in that case. One can't read, as we would argue, you can't read the colony case and believe that there was a gap for an agency to fill. But when you use the tools of statutory construction, the legislative history made clear Congress had answered the question. Go ahead. That leads to the Brand X question. Sure. What role do you think legislative history has in the step one of Chevron? I believe it has the same... In the presence of a regulation that is contrary to a party's reading of the statute, what role does legislative history have in determining whether the statute is clear or contrary to the regulation? It has the same role that it had in Chevron. Our position is that Brand X certainly didn't overrule Chevron. Brand X even says we are applying the Chevron framework. And although Justice Thomas, writing for the court, starts with looking at the terms, Justice Thomas, even in his step one analysis, has a subsection devoted to what was effectively the legislative history of that statute. If you look at section... Are you talking about the regulatory history? The regulatory... So that's what I was going to ask you. Do you happen to know in Brand X, checking the briefs and the history of that case, he did discuss the regulatory history. Was there any legislative history to speak of that he just rejected sub silencio or was there not? As far as I'm aware, there wasn't. And the regulatory history was really the background that Congress was legislating against when it wrote the law that was then the subject of Brand X. I'm not aware of any. And Justice Thomas certainly does not say in Brand X, I'm not going to look. There was a floor debate. There was a conference report, and we're not going to look at it. So our position, even as recently as yesterday in Mayo, Chief Justice Roberts, speaking for the unanimous court, says we begin our step one analysis with the Chevron framework, and he cites to pages 842 and 843 of Chevron. But not the footnote. Footnote 9 is on page 843. I understand. I know I'm being technical, but... We're both being technical. We're both being technical. But the point is, neither Brand X... The notion that Brand X sub silentio modified Chevron in a significant way... The step one of Chevron isn't, are the words ambiguous? Step one of Chevron is, as you all know, did Congress address the specific issue? Was there a clear congressional intent? And this court in Amber Messick and Star Glow, which post-8 Brand X, and the Supreme Court in General Dynamics, which was before Brand X by a year, these are all cases that use legislative history as a tool of statutory construction, just like in Chevron. And the notion that Brand X, without saying so, has changed that structure, we respectfully disagree with the government's position on that. But as you no doubt know, the problem with applying Chevron, the footnote in Chevron, aggressively, it seems to me, would be that you end up confining Chevron to a tiny sliver of what it's generally understood to be, because you will import more and more of the conventional judge determination of what a statute means by looking at the legislative history, looking at the problems that were attempted to be addressed, and statutory construction maxims, everything else, which is exactly what a court does in the absence of regulations. And the court will ultimately conclude, well, it's a tough call, but here's our best call for what the Congress must have meant. And then you're done, and there's no Chevron, because you've decided everything in step one. What's the difference between what Justice Stevens was suggesting as the way to get at the question, versus what a court would do in an ordinary case when there was no regulation? Well, legislative history cannot be used to contradict the clear meaning of text of a statute. And so if the words on their face were plain… That would be true in the context of a decision that would be made without the assistance of regulation. That's true. The question is, what's the difference between what a court would do under the footnote 9 regime and what it would do if there's no regulation at all? If there's no regulation at all, the court has to decide. If there was no regulation and the court looked at legislative history and context and purpose and still says, we don't know… Ultimately, the court has to draw a conclusion. It has to make a decision. This is what Congress meant. This is our best call. Or the court might say, in the face of no regulation, we don't believe Congress spoke clearly on this issue, but we will now come up with what we believe to be the most persuasive interpretation of that statute. That would be our best take. That's right. The court would fill that gap. The court is saying that Congress has filled the gap. It just hasn't done it with the specificity that we would be pleased to see. You're right. But again, going back to Colony and Salmon Ranch, I don't think you can look at Colony and conclude that this is one of those cases. Even though there was no regulation there, when Colony put all that legislative history together, we think it led the Supreme Court to say, omit means leave out. It walked through all of the floor debate and other legislative history and said, when you put all that legislative history together, we don't think there's an ambiguity and we have to offer our best judgment. We think Congress clearly expressed its intention through the other tools of statutory construction. But it is a little more difficult, is it not? Because, as I said, Colony was no regulation pre-Sherlock. So we've got to put a gloss on it. We've got to decide whether the Supreme Court's analysis of the legislative history, I mean, clearly they could have taken more liberties because they had nowhere else to go. And so the suggestion that this is persuasive, that it doesn't appear to us that Congress had a broader purpose, I mean, that may have been – different words may have been used in the backdrop of Chevron and particularly in the existence of these regulations. Don't you think that's a fair assessment? I think so. But I think there's something else that we're losing about Brand X, which is a very significant overstatement by the government about what Brand X was doing. Brand X was not a case where the FCC had lost the judgment below and was trying to regulate its way out of the adverse judgment entered against it. There is something incredibly troubling about what the government is trying to do here with this regulation that is even more troubling than many of the other cases that are pending in the other courts of appeals. Well, in Brand X, though, the government had an adverse districtal decision, and I think the opinion – am I wrong? And then the opinion speaks a great deal taking issue with what the district was. But the big difference is the regulation was issued prior to the litigation. Just like in Mayo, there was litigation out there and Treasury issued a regulation, but it's not accurate in the government's 28-J when they suggest it. I just want to be sure the court is clear. It wasn't the Mayo case that prompted the regulation. In this instance, we have a final judgment from Judge Allegra, and the government here on appeal is now putting the regulation forward, and there's something particularly troubling here. We got up to this court in mid-2008, just a few months after Salmon Ranch, and the government asked this court to hold this case in abeyance. Why? It was closely related to Salmon Ranch. The issue was the same, and the government said conserve resources. So we got held in abeyance. I appreciate the history. Can I go back to your answer to my question to make sure I understood it, right before you got into the Brand X discussion? Okay. I thought you were agreeing with the statement I made that we can sort of read the language, the colony's discussion of the legislative history kind of with a gloss, which is, well, there were no regulations pending. There was no Chevron opinion yet. So we could gloss, put that gloss on our read of the legislative history, on the terms the court used in discussing the legislative history. Oh, I'm sorry. Maybe I didn't understand. I very much believe that colony was decided like a Chevron step one case, meaning I understand there was no regulation, but the court, I believe, felt that Congress did answer the question. It may not have answered it just with the word omit in isolation, but when you put omission from gross income in context and you look at the legislative history, I believe the colony Supreme Court said Congress has answered this question, and then it rejected the government's interpretation, which is the same interpretation at use by the government today and in the final regulation, as contrary to that intent. And I think that's what Salmon Ranch concluded as well. The 1954 language is identical to the 1939 language. That's Salmon Ranch. And Salmon Ranch says the disposition controls. What's your response, then, to the government's argument, which makes it that language may be identical, but there's additional language added in 54 that would change the gloss on 39. But that language doesn't even come into play here because what we're trying to evaluate, what's before the court, is does an overstatement of basis constitute an omission from gross income? And omission from gross income is the identical language. Even though there were other subsections provided, that did not persuade the Salmon Ranch Court. I mean, those provisions were in front of the Salmon Ranch Court because the Salmon Ranch Court was looking at the 1954 amendments, and that didn't change the Salmon Ranch Court's position and our position is Salmon Ranch is obviously controlling here. Now, to go back to your point about the arguable importance of the fact that there was a judgment from Judge Allegra in this case, you say there's something distinctly unappealing about the notion of the self-help sense of the government trying to assist itself on appeal by promulgating regulations. But assuming the rest of your arguments are not valid and the case comes down to this argument, it does seem to me to be peculiar, maybe even perverse, to say that if there are 20 people in your client's position around the country, that the government can win in all of those cases in which the judge's gavel has not come down yet, but that you win because the trial judge's gavel has come down, even though the case is still fully open on appeal and may ultimately find its way to the Supreme Court. So you say it's anomalous, but I wonder if the anomaly isn't in the fact that your client would be the adventitious beneficiary of a timing of the district court's ruling, or in this case, the CFC's ruling. You go to a court where the ruling occurs before the regulation issues, you win. You go to a court where the ruling in the trial court, all subject to appeal, occurs after the regulation issues, you lose. A few responses. Number one, taxpayers have the right to either file this kind of case in the tax court, federal district court, or the federal court of claims. And there are consequences with doing that. The taxpayer has to put forward the dollars in dispute when they decide to file the suit in this court. And we would submit that the fact that we were timely in bringing this lawsuit and got a final judgment from the court of federal claims actually should have consequences. The notion that a private litigant only gets a pyrrhic victory when it has litigation against a government agency and the government agency can change the rules of the game midstream up on appeal. The predicate for this question, of course, is that the government is entitled to change the rules midstream. The only question is where the stream comes to an end. You say, again, by hypothesis, that the government is free to issue those regulations and have those regulations entitled to full Chevron benefit until the moment that Judge Allegra decides this case. On that day, the government cannot get Chevron deference to its regulations in your case. Well, two things. And that just seems to me to be peculiar. Well, two things. The government in the preamble makes the decision to say that finality is measured within the meaning of 7481. I won't repeat the argument, but 7481, that's the government talking in the preamble. The government said if a case is final for purposes of 7481, not final for 7481, this regulation can apply. And as I pointed out earlier, the government would be violating another statute of Congress, 6226G, if it were to say we're going to ignore the fact that there's a different rule of finality in the federal court of claims than there is in the tax court and to try to apply it here. But the other problem, and I was speaking about this with Judge Prost a minute ago, it is troubling that the government here is trying to seek a tactical advantage by having had this case held in abeyance for more than a year, because the reality is we would have certainly been briefed, argued, and possibly decided had our case just gone trucking along in July 2008, and we would have gotten a decision just like Salmon Ranch. For that matter, after Salmon Ranch was decided and the government had the 45-day window to petition for rehearing, the government asked for another 30 days because the Solicitor General needed to decide whether or not he was going to petition for rehearing en banc. And then, during that extra 30 days, the government issues this regulation. I'd submit that in this court, both in Salmon Ranch and here, and what I care about is obviously this case, the government has tried to gain a tactical advantage by its delay of the case. And in that instance, we would have been done. We would be final like Salmon Ranch, but for the fact that we had this period where we were put on ice, when the government said, we just want to save resources and not have to do more briefing, why? Word for word, the government says in that motion, because the outcome of Salmon Ranch may be a dispositive of this case, and there may be nothing more to do. And of course, that's not the case. The private litigant now is basically litigating a second case up in the federal circuit because the government changed the rules. If Salmon Ranch had come out differently, the government would have been done. If Salmon Ranch had come out and had said it was ambiguous and deferred to the government? Well, they had ruled that the government wins without the need for regulations. Salmon Ranch would have been dispositive of our case. Right, so they weren't wrong in saying that this case could be dispositive of your case. Right, but at the time that they said that, the government was actually working on this regulation project and never suggested to the court or to the taxpayer that we might be impacted and we might have a loss of some of our rights or the case would change in some significant way. Thank you, Mr. Ruehl. Thank you. Mr. Rothenberg, you may have five minutes to move on. Thank you. I hope I've made the government's position clear on legislative history. If you look at legislative history and say, well, legislative history controls, there would be no room for Chevron and Brandeis and administrative interpretation. The reason we think, you know, when the court was issuing colony, it was trying to decide what's the best result with the 39 Code? And when it looked to see what would Congress have in mind, it had in mind leaving out, hiding the ball. Congress in 54 addressed that very point with the adequate disclosure provision that it inserted into the 54 Code so that it made it much harder for you to hide the ball. And that's really the point of why this regulation is reasonable because in basis overstatement situations where you don't adequately disclose, you are hiding the ball. If you look at the tax returns in this case, there's no way to figure out from the face of the return. Well, let's assume hypothetically that we reject that. So you're left with just, you know, whether or not Brandeis changed the landscape of Chevron with respect to legislative history. Well, I think. And the government, I mean, assuming that isn't on the table, the government's position would not change, right? Well, we think Brandeis' discussion of when a regulation controls is certainly not completely consistent with footnote 9 of Chevron. And we think the only role legislative history can play, where you have a choice of interpretations, if there's a choice of interpretation which you have to have in order to say the regulation is valid, where there's a choice, we think Brandeis says the regulation is valid. And the only way the regulation cannot be valid is if the words of the statute can only be interpreted one way. And if the words of the statute can only be interpreted one way, then there is no room for a regulation. And in this case, the words clearly can be read several ways. And I come down to the fact that it's not just the word omits. The concept of gross income in the Internal Revenue Code, its calculus is amount realized, subtract basis. So you can't determine gross income without knowing your basis. Could you take a minute before your time runs out to respond to the 7481 reference in the preamble that the other side talked to? So the government kind of conceived of that because that's the question. No, there is a special finality rule for tax court cases, and that is 7481. But the point of the regulation was if you have, like, Bakersfield, that case is over. The regulation cannot resurrect it. Salmon Ranch is over. It can't resurrect it. There are other cases that the government didn't appeal. They're over. This case is not over. And if the government's interpretation of when does a six-year statute kick in is right, then we win in this case and in the other cases. So we don't think there's anything untoward. I wish I controlled the Treasury Department. I don't. They issue regulations when they issue regulations. And the government was considering, do we take this issue to the Supreme Court without regulations? I mean, it was certainly our motion made that point. You know, I personally was pushing for en banc, but it's higher up in the food chain than myself to make that determination. Well, a lot of taxpayers wish they controlled the Treasury. Yes, same thing. Thank you, Your Honors. Thank you, Mr. Offenburg. The case will be presented under the right.